IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BOBBY KIMBLE,

               Plaintiff

    v.

GARY BOUGHTON, MARK KARTMAN,
LACEY DICKMAN, DANIEL WINKLESKI,
ANGELA MINK, and ANTHONY BROADBENT,

           Defendants.

OPINION AND ORDER

Case No.  19-cv-645-slc

---

While incarcerated at Waupun Correctional Institution, pro se plaintiff Bobby Kimble assaulted and seriously injured a correctional officer. Disciplinary proceedings followed, as did criminal charges of attempted first degree intentional homicide, false imprisonment, and battery by a prisoner. Kimble was transferred to the Wisconsin Secure Program Facility (WSPF) where he was placed on a restrictive, non-punitive status called administrative confinement.  Kimble remained in administrative confinement for five years, subject to periodic staff reviews confirming his placement.[1]

Unhappy with his inability to earn his way into WSPF's general population, Kimble filed this due process lawsuit against WSPF officials Mark Kartman, Lacey Dickman, Daniel Winkleski, Angela Mink, and Anthony Broadbent related to their roles in keeping Kimble on administrative confinement between 2017 and 2019; Kimble also is suing WSPF's Warden, Gary Boughton, for requiring Kimble to remain in administrative confinement until Boughton deemed Kimble ready for less restrictive placement.

Kimble has filed a motion for summary judgment on his claims against Boughton, Dickman, Kartman, and Mink.  (Dkt. 55.)  Defendants seek summary judgment on all of

---

[1] On June 30, 2021, while summary judgment motions were pending in this lawsuit, Kimble was removed from administrative confinement and placed in WSPF's general population.

Kimble's claims.  (Dkt. 71.)  The undisputed evidence of record establishes that the defendants' handling of Kimble's placement within administrative confinement afforded him the process that Kimble was due under the Fourteenth Amendment.  Therefore, I am denying Kimble's motion for partial summary judgment, granting defendants' motion for summary judgment, entering judgment in defendants' favor, and closing this case.

UNDISPUTED FACTS[2]

A.  Parties

Plaintiff Bobby Kimble currently is incarcerated at WSPF.  He has been incarcerated by the Wisconsin Department of Corrections (DOC) since 1998, and at WSPF since 2016.

Defendants were all WSPF employees during the relevant time period: Gary Boughton was the warden, as he still holds that role; Daniel Winkleski was the deputy warden but now works at a different institution; Mark Kartman was the security director and still holds that position; Anthony Broadbent was a unit supervisor and still holds that position; Lacey Dickman was a social worker and still holds that position; and Angela Mink was a Psychological Associate in WSPF's Psychological Services Unit (PSU) and still holds that position.

B.  Kimble's Crime of Conviction and Disciplinary Record within the DOC prior to
   WSPF Placement

Kimble currently is serving a sentence of approximately 157 years of incarceration for convictions involving burglary, sexual assault, operating a vehicle without consent, battery, burglary, and escape. Since his incarceration, Kimble has received three major conduct reports

---

[2] The facts set forth in this opinion are material and undisputed, unless otherwise noted.  The court has drawn all facts from the parties' proposed findings of fact and responses, and the underlying evidence, as appropriate.

and two minor conduct reports.    The major conduct reports were from 1999, for use of
intoxicants; 2004, for soliciting a staff member; and 2015, for (1) assault on an employee, (2)
taking a hostage, (3) possession, manufacture, or use of a weapon, and (4) disobeying orders,
after Kimble assaulted a correctional officer at Waupun.

In Kimble's 2015 conduct report, it was alleged that on October 30, 2015:

- As the correctional officer entered the bathroom, Kimble
  rushed the door and confronted her in the doorway; she
  ordered him to back up but Kimble refused and told her he did
  not like the way she looked at him; and when the officer then
  ordered him again to back up, Kimble punched her in the face
  with a closed fist, pushed her in the bathroom, and locked the
  door.

- Then Kimble struck her several times in the face with a closed
  fist while she was on the bathroom floor, and when the officer
  was able to move closer to the door, Kimble began choking her
  from behind, stating "I am going to fucking kill you."

- The officer was able to reach the door and unlock it, and
  responding staff reported they heard the officer screaming for
  help and that when the door opened they observed Kimble
  holding the officer in a choke hold.

- Staff used a Taser to subdue Kimble, who was initially resistive,
  and he was transported for a strip search where KImble
  revealed he had a weapon concealed in his waistband, the
  metal from a clip board.  Staff secured the metal as evidence.

- The female correctional officer that Kimble attacked was sent
  to the hospital and treated for several serious injuries, including
  injuries to the right side of her face and right eye, bleeding
  from her nose, bruising and swelling to both sides of her head,
  and bruising on both sides of her neck.

(Ex. 1000, dkt. 75-1, at 2.)[3]

---

[3]  Although Kimble disputes that  events transpired as written in the conduct report, he does not
dispute these allegations were lodged against him, or that he was found guilty on all charges. Kimble
claims that this conduct report is immaterial; that's incorrect. This report is highly material because
Kimble's assault of a correctional officer was the main–but not the only– reason for his continued
administrative confinement placement at WSPF.

Waupun staff informed the Dodge County Sheriff's Office about the assault, and a criminal investigation commenced. Kimble admitted during an interview to striking the officer several times with closed fist; confining her to the bathroom and attempting to prevent her from opening the door; and possessing a piece of metal from the clip board (although he stated he did not intend to use it against the officer). Kimble was transferred to Columbia Correctional Institution immediately following the assault.

DOC administrative proceedings followed. On December 7, 2015, Kimble was found guilty of all of the charged infractions in Conduct Report #2720823. Kimble appealed this disposition, claiming that he did not receive a fair hearing because he was not allowed witnesses, and the reviewing officer agreed, finding that the case should be returned to the disciplinary hearing officer for a re-hearing that would permit Kimble to call witnesses. On April 12, 2016, Kimble was again found guilty on all of the charges, and received the same disposition, which was 360 days' disciplinary separation and confiscation of contraband.

In the meantime, Kimble was charged in Dodge County with Attempted 1st Degree Intentional Homicide, False Imprisonment, and Battery by Prisoner. *State v. Kimble*, Case No. 2016CF97 (Dodge Cty.), *available at* https://wcca.wicourts.gov/ (last visited Aug. 26, 2021). Kimble pled no contest to the attempted homicide charge; the false imprisonment and battery by prisoner charges were dismissed but read into the record. On April 7, 2017, Kimble was sentenced to 15 years' incarceration and 20 years of extended supervision, consecutive to the sentence he was already serving.

**C.  Kimble's Transfer to WSPF and Placement on Administrative Confinement**

On June 7, 2016, Kimble was transferred to WSPF as a result of the disposition of Conduct Report #2720823.  Upon arrival, Kimble was placed in disciplinary separation and then temporary lockup status to determine whether to place him on administrative confinement. On June 22, 2016, Kimble was placed on administrative confinement status, after the Administrative Confinement Review Committee (ACRC) determined that there were reasonable grounds to believe that Kimble presented a substantial risk of serious physical harm to staff and inmates, as well as a threat to the overall security of the institution.

Administrative confinement status is defined as a nonpunitive placement in restrictive housing for inmates whose continued presence in general population poses a threat to life, property, himself, staff, other inmates, or to the secure and orderly operation of a facility. More specifically, under Wis. Admin. Code. § DOC 308.04(2), an inmate may be placed in administrative confinement if:

> (a) The inmate presents a substantial risk to another person, self, or institution security as evidenced by a behavior or history of homicidal, assaultive or other violent behavior or by an attempt or threat to cause that harm.
>
> (b) The inmate's presence in general population poses a substantial risk to another person, self or institution security.
>
> (c) The inmate's activity gives a staff member reason to believe that the inmate's continued presence in general population will result in a riot or a disturbance.
>
> (d) The inmate has been identified as having an active affiliation with an inmate gang or street gang or there are reasonable grounds to believe that the inmate has an active affiliation with an inmate gang or street gang; and there is reason to believe that the inmate's continued presence in general population will result in a riot or a disturbance.
>
> *Id.*

5

Consistent with the procedures set forth in Wis. Admin. Code. ch. DOC 308, the ACRC regularly reviews administrative confinement placements. The warden appoints the three members of the ACRC, which includes one member from security, one from treatment, and one supervisor who serves as the hearing officer. An inmate is placed on administrative confinement status if the ACRC's decision is unanimous; the warden decides placement if the committee is not unanimous. Administrative confinement status is reviewed every six months, in addition to being reviewed every 30 days by unit staff. When an inmate has been in administrative confinement for more than 12 months, the ACRC's decision is automatically referred to the warden and/or the Division of Adult Institutions (DAI) Administrator for their review.

**D.  HROP and PACE Programs**

Separate from the ACRC reviews, WSPF offers inmates the opportunity to move from administrative confinement into general population by participating in an incentive program. Up until 2018, that program was called the High Risk Offender Program (HROP). HROP was organized into three phases: Red, Yellow, and Green. As inmates progressed from the most restrictive phase (Red) to the least restrictive (Green), they earned more privileges. Although decisions were made on a case-by-case basis, the program anticipated that prisoners would spend several months in each phase: Red for approximately two months, Yellow for approximately three months, and Green for approximately seven months.

Unit teams reviewed inmate status on a monthly basis. The unit team was comprised of a unit supervisor, social worker, unit sergeant or officer, program department staff, health services staff, and psychological services staff. During the monthly review, the unit team

assessed each HROP inmate to determine risk levels and to make phase placement recommendations. Movement between phases was based on inmate performance, compliance with the requirements of the program, and the risk posed by each inmate. The unit team forwards its recommendations to the security director, who incorporated other risk factors of each inmate and then recommended approving or denying the unit team's recommendation to the warden. Security Director Kartman explains that in preparing his recommendation to the warden, he considered any possible risk the inmate might pose, so he factors in the inmate's history with staff, actions that led to incarceration, and actions while incarcerated. Although the unit team and security director made recommendations, the warden always had the final say as to movement through HROP phases. Inmates who completed all three phases underwent a security assessment to determine their risk level. If all criteria were met, then the inmate would be recommended for placement in general population.

On May 7, 2018, WSPF discontinued HROP and implemented an essentially identical program called Progressing through Administrative Confinement Effectively (PACE). The PACE program consists of four phases through which prisoners progress toward general population status. The length of each phase varies based on inmate participation and behavior, but the expectation is that Phase 1 takes about one month, Phase 2 takes two months, Phase 3 takes three months, and Phase 4 takes about six months. Inmates in Phase 4 have many of the same privileges as inmates in general population, with the primary difference being that Phase 4 inmates are closely monitored by staff and are subject to staff escorts. Phase 3 inmates who are eligible for Phase 4 must apply for advancement, which requires four staff references.

Like the HROP, the PACE program provides for unit team review every month.  Again, although the unit team and security director may recommend movement through the program, the warden has the final say.  The policy further provides that the warden may release a prisoner from administrative confinement at any time.

**E.  Conditions of Confinement in Administrative Confinement**

WSPF inmates in restrictive housing can receive as much as 5-10 hours of out-of-cell leisure activity per week, depending on their status.  Efforts are made to ensure that administrative confinement inmates have two chances for indoor recreation and two chances for outdoor recreation per week, but inclement weather and staff training or slow-down days may reduce the availability of out-of-cell exercise.  Kimble's unit contains seven outdoor recreation areas and 12 indoor recreation areas.  The indoor recreation areas are small: they vary from 6 feet by 9 feet to 6 ½ feet by 12 feet.

Inmates in HROP/PACE additionally receive opportunities for certain congregate activities, including laundry folding and program classes, as well as non-congregate classes.  The HROP provided that inmates in the Yellow Phase were allowed six out-of-cell hours per week. Inmates in the PACE program may have access to more out-of-cell activities if they are in a phase with more privileges. For example, Phase 3 inmates can participate in seven hours out-of-cell activities with up to two other inmates, and Phase 4 can participate in up to 10 hours of out-of-cell activity per week, with up to three other Phase 4 inmates in congregate out-of-cell activities such as recreation, assigned duties, and education.  In addition, Phase 4 inmates may leave their cells for work, which includes cutting dental floss and compiling intake packets, and they may

8

eat meals in the day room.  Phase 4 inmates are not restrained when escorted from their cells to the recreation area.  Inmates in other phases of the PACE program are restrained on a case-by-case basis depending on their risk level.

Legal materials are available during legal recreation periods, which take place in the electronic law libraries.  Inmates may have one hour and 15 minutes per week for legal recreation time, unless they have an upcoming court deadline, in which case they receive double that time period.  All administrative confinement inmates may participate in high school equivalency diploma programs, may participate in individual religious studies and personal meditation in their cell, and they can request religious property items and literature, depending on their status. Phase 4 inmates are allowed to participate in a social skills group, which lasts approximately eight weeks.

At the time Kimble entered administrative confinement, he was allowed just three calls per month.  In the PACE program, Phase 3 inmates are allowed six fifteen-minute calls a month, and Phase 4 inmates may make eight fifteen-minute phone calls a month.  Inmates in restrictive housing also have access to video visits on closed circuit cameras with family and friends, for one hour per week.

As for property items, administrative confinement inmates may possess in their cells up to four library books and 25 personal publications, which is greater than the property available to inmates in disciplinary separation.  They also may possess a cup, bowl, limited food items, and a radio or television, as well as hygiene items, paper, photographs, playing cards, glasses, and ear plugs, as well as a weekly canteen order.  PACE inmates receive more property privileges based on their phase: Phase 3 and 4 inmates can received two electronic items, and Phase 4 inmates

may possess personal clothing, such as shorts, sweatpants, a sweatshirt, t-shirt, and stocking cap. However, Kimble claims that he did not have access to certain property items available to general population inmates, including an electronic razor, fan, typewriter, hard cover books, regular ink pens, color and regular pencils, personal underwear and socks, and hobby items.

Inmates in restrictive housing have access to two 20-minute periods of time to shower each week. On shower days, inmates receive a clean set of clothing, towel, and washcloth. WSPF's ventilation system is monitored by a computerized program, and all housing units maintain an average temperature of 68 to 72 degrees during the cold weather months.

## F.   Kimble's Administrative Confinement Placement and Reviews

When Kimble was first placed in administrative confinement in June 2016, defendant Broadbent served as the hearing officer for the ACRC hearing that took place on June 22, 2016. Prior to the hearing, Kimble submitted a DOC-73, Inmate's Request for Attendance of Witness/Evidence form, asking that Officer Gray, Sergeant Chatman, and Captain Radtke from Columbia appear as witnesses. Kimble also requested multiple videos from Columbia that would show he was not wearing restraints in his unit, and the video of the assault on the Waupun officer, which would show that he did not push her into the bathroom. Broadbent denied Kimble's request for the Columbia witnesses to appear: he determined that because none of them worked at WSPF, they were unavailable for the hearing at WSPF. Broadbent denied the request for video footage pursuant to Wis. Admin. Code § 303.87(2)(b)(3), because this evidence would duplicate the information already provided in the administrative confinement packet. Kimble purports to dispute this, but does not cite evidence creating a genuine dispute

10

as to Broadbent's reason for denying the request for the footage, instead arguing that Broadbent chose to rely on false information.

During the hearing, Kimble stated that he regretted the staff assault at Waupun, that he should have talked to security about the issues he was having, and that he had been incarcerated for 31 years and had never disrespected or touched staff.  The ACRC, comprised of Officer Hunt, Dr. Hoem, and Broadbent, reviewed Kimble's underlying convictions, his conduct report record (including the 2015 assault); Kimble's written statement; the Recommendation for Administrative Confinement; Kimble's Inmate Re-Classification Report; and DOC-30 Review of Offender in Restrictive Housing forms, dated December 2015, January 2016, March 2016, April 2016, and May 2016.  The ACRC unanimously recommended Kimble for administrative confinement, finding reasonable grounds to believe he presented a substantial risk of serious physical harm to staff and inmates, as well as a threat to the overall security of the institution. On June 30, 2016, Kimble appealed that decision.  On September 1, 2016, Boughton affirmed the ACRC's decision, citing Kimble's "serious assaultive" current offense and "serious assaultive" history.  (Ex. 1003, dkt. 75-4, 331.)

Kimble was recommended for the Red Phase of HROP in July of 2016.  Kartman and Winkleski approved that placement.  (Winkleski was authorized to approve that placement as the warden's designee.)  Thereafter, a unit team reviewed his placement every 30 days.  To evaluate each inmate, the unit team reviewed behavior log entries, conduct reports, COMPAS scores (an assessment tool to determine individual inmate needs), program plans (plans the inmate must complete to move on to the next phase), and previous reviews.  Inmates can request to be present for their review, and the unit team may request an inmate's attendance, but per

11

policy, inmates may only attend one review per color or phase.  After the unit team conducts its review, each member votes to determine the team's recommendation to the security director.

On September 21, 2016, Kimble was promoted to Yellow Phase by non-defendant Unit Manager Lebbeus Brown and defendant Dickman, based on Kimble's positive conflict resolution, problem solving, hygiene, motivation, and independence.  The recommendation noted that Kimble did not have any clinical issues, and that he had completed an anger program, interactive journaling, and the interpersonal skills guide, as well as requested the empathy guide.  Kartman and Boughton approved Kimble's advancement.

In October and November, Kimble completed more guides.  On November 9, 2016, Brown and Dickman assessed Kimble; they noted that he had completed multiple programs and they recommended additional programming.  Kartman recommended that Kimble be retained in the Yellow Phase, and Boughton approved this approach.

On November 29, 2016, Boughton sent a memorandum to Kimble, writing that the HROP program sets a minimum amount of time a prisoner must spend in a phase before he may advance to the next phase.  Boughton advised that prisoners must remain in the Green Phase for seven months before they can graduate to general population.  Boughton further wrote that because of Kimble's upcoming court case on the charges arising out of his attack on the correctional officer, he would not advance from Yellow to Green Phase at that time.  Finally, Boughton added that Kimble had more privileges staying in the Yellow Phase than not participating in the program, but that Kimble was free to withdraw if he wished.

Boughton attests that he did not feel comfortable advancing Kimble to Green Phase while the criminal charges related to the staff assault were pending.  He further explains that inmates

12

on Yellow Phase actually did have more privileges than inmates in administrative confinement who were not part of HROP: they had more access to phone calls, more out-of-cell time, and more supervised congregate activity.

Consistent with Boughton's letter to Kimble, on December 7, 2016, Brown and Dickman assessed Kimble, and recommended that he stay on Yellow Phase, specifically noting Boughton's request. On December 14, 2016, an ACRC hearing was held to review Kimble's placement. Kimble did not attend this hearing or submit requests for witnesses or admission of other evidence. The ACRC members that day were Officer Godfrey, Dr. Hoem, and Broadbent. They reviewed Kimble's underlying convictions and Kimble's conduct report record (including the 2015 assault), Kimble's written statement, and additional assessment documents that had been updated since his June hearing. The ACRC unanimously decided to recommend Kimble for administrative confinement, finding reasonable grounds to believe he posed a substantial risk to others and within the institution.

On December 27, 2016, Kimble wrote to Dickman, asking why he was being denied advancement to the Green Phase even though he had done everything required by policy to advance. Dickman responded that Kimble would continue with Green Phase programming with the exception of Green Phase Group.

Thereafter, from January 4, 2017 through November 29, 2017, the unit team declined to recommend that Kimble advance to Green Phase, citing Boughton's request that Kimble remain in the Yellow Phase while his criminal charges were pending. However, in those reviews, the unit team incorporated Kimble's behavior and positive adjustments. Specifically, in January 2017, the unit team noted that on December 28, 2016, Kimble had received a rule violation for

13

"fishing to another cell," meaning he was trying to pass another inmate something; in February, March, and April, the unit team noted, in addition to the ongoing court case, that Kimble had been moved to a new cell in November and his mattress had a large tear but he had not been disciplined; and in the May 2017 review, the unit team discussed that Kimble had requested Better Way programming and noted no new rule violations.  Kartman agreed with each recommendation.  Kartman attests that he was unaware that Boughton had directed the unit team to continue to recommend the Yellow Phase, but Kimble maintains that Kartman reviewed a document in which the unit team indicated that they were recommending Yellow Phase "per Warden's request," so Kartman's knowledge is disputed.  Boughton approved each denial.

About halfway through this year-long period in which the unit team's and Kartman's recommendations went unchanged, Kimble pled no contest to the attempted first degree intentional homicide charge, and the other charges against him were dismissed.  Kimble was sentenced on April 7, 2017, to 15 years' incarceration and 20 years extended supervision.  At that point, Boughton's reason to retain Kimble in Yellow changed slightly; he noted that Kimble had only been on administrative confinement for seven months, and decided it was appropriate to require Kimble to demonstrate positive behavior for an extended period of time before he could advance to Green Phase,  and possibly back to general population.  A week later, on April 14, 2017, Boughton and Brown met with Kimble and they talked about his sentence.  According to Kimble, Boughton recommended that Kimble drop out of the HROP program, essentially indicating that Kimble's status would remained unchanged.

Kimble subsequently wrote to Dickman, again complaining that he had completed all the programming necessary for him to advance.  Dickman responded that he could either drop out

of HROP or continue to follow his plan.  As a result, from May 2017 to November 2017 the unit team continued to cite Boughton's request.[4]  Winkleski's involvement was limited to just the October 2017 review, in which he agreed to recommend that Kimble remain on Yellow Phase. Boughton approved Kimble's Yellow Phase placement throughout this six-month period of time.

On June 28, 2017, Kimble sent Boughton a letter concerning his advancement to the Green Phase, raising his concern that other inmates similar to him had been advancing while he remained in the Yellow Phase.  On July 3, 2017, Boughton responded in writing that he was disheartened that Kimble did not grasp the severity of his actions that may have resulted in the death of a correctional officer if others had not intervened, commenting "you believe you should be released to the general population within 2 years of attempting to kill a member of the correctional society."  (Ex. 1011, dkt. 76-2, 12.)    Boughton further wrote that he felt that keeping Kimble in Yellow Phase afforded him more privileges than if he were not participating in HROP; that his placement was reviewed every six months; and that he could drop out of HROP if he did not wish to participate.

---

[4]  By way of example, here is the Unit Team's October 2017 Summary:

> COMPLETED ANGER PROGRAM, TURNING POINT 1, TURNING POINT 2, TURNING POINT 3, BETTER WAY, INTERACTIVE JOURNALING, FREE YOUR MIND AND RET ACTIVE IN NEW FREEDOM WITH PSU AND CASTLE OF THE PEARL.  COMPLETED THE FOLLOWING CAREY GUIDES: INTERPERSONAL SKILLS, EMPATHY, ANTI-SOCIAL THINKING, PROBLEM SOLVING, EMOTIONAL REGULATION, OVERCOMING FAMILY CHALLENGES, MORAL REASONING, AND ANTI-SOCIAL PEERS.  UNIT TEAM RECOMMENDS RETAINING ON YELLOW PHASE PER WARDEN'S REQUEST.

(Dkt. 59-15.)

In November of 2017, Boughton communicated to Kimble's unit team that they should make whatever recommendation they deemed appropriate with respect to his placement.  On November 29, 2017, the unit team recommended that Kimble be promoted to the Green Phase, with Kartman approving that recommendation.  Boughton denied this recommendation, keeping him in the Yellow Phase.

On November 29, 2017, the ACRC reviewed Kimble's placement. Prior to the hearing, Kimble submitted a DOC-73 form, requesting three witnesses: Lacey Dickman, Unit Manager Brown, and Captain Nufeld.  Kimble indicated he wanted Nufeld to appear with "any evidence that I acted on 10/30/1[5] without provocation as [Captain Nufeld] writes in the DOC-121/Also evidence to show I pushed staff into bathroom." (Ex. 1003, dkt. 75-4, 265.)  Broadbent denied Kimble's request for Dickman's and Brown's testimony, citing Wis. Admin. Code § DOC 303.84(4)(c),[5] which provides that irrelevant testimony could be excluded.  Broadbent attests that their testimony would have been irrelevant to whether Kimble should remain on administrative confinement because the packet of materials would include copies of Kimble's behavior log, conduct report history, and any DOC-30B forms completed by the unit team, which would incorporate input from Dickman and Brown.   (Broadbent Decl., dkt. 75, ¶ 24.) Broadbent also denied Kimble's request for Captain Nufeld's presence because Nufeld did not work at WSPF and thus would be unavailable to attend the hearing.

During the hearing,  the ACRC members were Broadbent, non-defendant Officer Meyer, and Dr. Mink.  Kimble asked to be placed in general population.  Kimble disagreed that he was

---

[5] Kimble asserts that only the security director, not Broadbent, was authorized to address Kimble's witness requests.   Because Wis. Admin. Code § DOC 303.02(29) allows the security director to name a designee, defendants contend that Broadbent was authorized to make these determinations.

a threat to staff and inmates, arguing that the 2015 staff assault was an isolated incident, he had never assaulted another inmate, and he had not had a conduct report in 12 years. Kimble further complained that he was not being allowed to progress through HROP, despite completing 19 programs and having no disciplinary infractions since being placed in administrative confinement. Like the prior reviews, the ACRC considered Kimble's underlying conviction, his conduct report history, Kimble's written statement, the recommendation for his placement, his re-classification report, and his risk assessment guides from June 2017 through November 2017. The ACRC unanimously recommended that Kimble continue in administrative confinement, agreeing that there were still reasonable grounds to believe that Kimble posed a substantial risk of serious physical harm to both staff and inmates, and a security risk to the institution.

At that point, Kimble had been in administrative confinement for over a year. Therefore, on November 30, 2017, Boughton reviewed the ACRC's decision and agreed with the recommendation, noting that Kimble's history indicated that placement in general population posed a substantial risk to others. On December 4, 2017, the DAI Administrator agreed, similarly finding that Kimble's presence in general population posed a substantial risk to others and to institution security. (Ex. 1003, dkt. 75-4, 263.)

On December 3, 2017, Kimble appealed the ACRC decision. On December 22, 2017, Boughton affirmed the decision because he felt that Kimble's recent serious staff assault, to which he had pleaded guilty, warranted continued administrative confinement placement. Kimble appealed Boughton's decision to the DAI Administrator, and on January 11, 2018, the DAI Administrator affirmed the ACRC's decision, finding that Kimble's placement complied with DOC 308.

17

Between November and December 2017, Kimble sent Boughton three letters, each requesting advancement to the Green Phase. On December 12, 2017, while Kimble was appealing the ACRC decision, Boughton sent Kimble a letter explaining that the final decision about his placement remained with Boughton, and that:

> [F]or the past year, I have requested the Unit team retain you in the Yellow phase rather than the option of reduction in phase or removal from the program. My intent was for you not to be "penalized" for not progressing, yet provide as safe of an environment to staff as possible.
>
> (Ex. 1011, dkt. 76-2, 9.)

Boughton added that he had instructed the unit team to make their own HROP placement recommendation, but that he, as the warden, would make the final decision about Kimble's progression. Boughton further noted that the ACRC was also reviewing Kimble's placement every six months.

On January 3, 2018, Kimble's unit team again recommended that Kimble be advanced to Green Phase, which Boughton again overruled. On January 7, 2018, Kimble wrote a letter to Boughton, asking for promotion to Green Phase, which Boughton denied, referring Kimble back to the December 12, 2017, letter. On January 31, 2018, the unit team recommended Kimble's promotion to the Green Phase, which Kartman joined, but again Boughton denied those recommendations, keeping Kimble on Yellow Phase. The same thing happened in February of 2018.

On March 13, 2018, Kimble wrote to Boughton, questioning why he was still on Yellow Phase, despite completing programming and not receiving any conduct reports. Boughton responded on March 19, noting Kimble's accomplishments but also that he hoped Kimble could

18

"appreciate how much weight [his] past choices, actions, and habits hold in the decision making process to retain [him] in Yellow Phase," referring Kimble back to their previous correspondence. (*Id.* at 2.)

On March 26, 2018, the unit team recommended that Kimble be promoted to Green Phase, which Kartman joined.  Boughton rejected their recommendation the next day, keeping Kimble on Yellow Phase again.  At the end of April of 2018, when WSPF switched from the HROP to the PACE program, the unit team, Kartman, and Boughton all agreed to assign Kimble to Phase 3.

On May 23, 2018, an ACRC hearing was held to review Kimble's placement.  Kimble did not attend.  Although Kimble had submitted a DOC-73 witness/evidence form, Broadbent was unable to locate a copy of that form, and does not know what happened to it, so the ACRC did not receive whatever evidence Kimble was seeking to add.  The ACRC consisted of Broadbent, Dr. Mink, and non-defendant Sergeant Snodgrass.  They reviewed the same materials from the previous reviews, as well as updated materials about Kimble's behavior from November 2017 to April 2018.  The ACRC unanimously recommended administrative confinement.  Boughton reviewed that decision on May 28, 2018, agreeing that Kimble's history indicated that placement in general population posed a substantial risk to others.  On June 1, 2018, the DAI Administrator agreed.

On June 14, 2018, the unit team recommended that Kimble be eligible to apply for Phase 4 of PACE, and after Kimble applied, Boughton approved his advancement on August 17, 2018. From September 2018 to December 2018, the unit team recommended that Kimble remain in Phase 4, and Boughton approved their recommendation.

19

On November 14, 2018, an ACRC hearing was held. Kimble neither attended nor submitted a DOC-73 form for witnesses or evidence. The ACRC consisted of Broadbent, Dr. Mink, and non-defendant Officer McDaniel. They reviewed all of Kimble's relevant and updated material and unanimously recommended Kimble for continued administrative confinement placement on the same ground previously stated. Boughton reviewed that decision on November 16, 2018, and agreed with it for the same reason, and on November 19, 2018, the DAI Administrator reached the same conclusion.

On January 4, 2019, the unit team and Kartman recommended that Kimble be returned to general population:

> Mr. Kimble has completed all required programming expectations for Phase Four including attending group, and interacting with other inmates. He has maintained positive and pro-social behavior, and solved any arised [*sic*] conflicts in pro-social ways. Based on Kimble's progress the Committee recommends that he be returned to General Population.

(Pl. Ex. 29, dkt. 59-29, 1.)

Boughton denied these recommendations on January 8, 2019, and Kimble's status remained unchanged. Boughton further informed the unit team and Kartman that the ACRC was responsible for recommending general population placement, not the unit team making PACE recommendations. Therefore, Boughton suggested that the unit team and Kartman submit DOC-30B forms to be included in the ACRC's materials for review.

Although the ACRC typically meets every six months, the unit team can recommend that the ACRC review an inmate early. The warden may approve or deny the recommendation and refer the inmate to the ACRC, but the ACRC alone decides whether to address an early referral, and its decision is not subject to appeal.

20

On January 16, 2019, the unit team and Kartman recommended Kimble for an early hearing before the ACRC, which Boughton approved.  The ACRC agreed to hold an early hearing, which it held on January 30, 2019.  Prior to the hearing, Kimble submitted a DOC-73 form, requesting Officer Wiegel, Officer Gallinger, and Captain Gardner to appear as witnesses. He also requested that Captain Gardner provide his DOC-30B Risk Assessment forms from August 2018, since Gardner helped Kimble connect with another inmate to mentor.  Broadbent denied these requests.  Broadbent attests that Wiegel's and Gallinger's testimony would not be relevant and would unnecessarily prolong the hearing because the administrative confinement packet included copies of Kimble's behavior log, his conduct report history, and the DOC-30B forms completed by the unit team, which would include information about Kimble's positive behavior.[6]

During the hearing, Kimble stated that he had been walking around staff and inmates since that August with no issues; he had completed the orientation group for general population; he had been on Phase 4 since August; and he had been shoveling snow on the unit as needed. Kimble also apologized for the past and said he continued to be positive.  The ACRC reviewed all the materials related to his placement, including the most recent DOC-30B Risk Assessment Information Guide forms, and they unanimously decided to recommend Kimble for administrative confienment, citing the same safety and security concerns from previous reviews.

---

[6]  At some point in April of 2019, Broadbent realized that there were two oversights related to the January 2019 hearing: the DOC-1875 Administrative Confinement Hearing form had an error stating that Kimble did not submit a written statement or witness form.  Also, Broadbent did not make a formal determination as to Kimble's request that Captain Gardner appear as a witness.  Therefore, on April 26, 2019, Broadbent amended Kimble's hearing documentation to remove the note that Kimble did not submit a written statement or witness form, and include his finding that Gardner's testimony would unnecessarily prolong the hearing because Kimble's unit behavior and conduct was included in his packet, and because Kimble was not a certified mentor.

On February 7, 2019, the unit team and Kartman recommended that Kimble stay on Phase 4, since he had just been reviewed by the ACRC the month prior.  Boughton approved this recommendation on February 13, 2019.  That same day, Boughton also reviewed the ACRC's decision, agreeing that Kimble should stay on administrative confinement because he still posed a substantial risk to others.  On February 22, 2019, the DAI Administrator agreed that Kimble should remain on AC, citing his "history of unpredictable, violent behavior toward female staff," and noting that Kimble is an "extremely dangerous individual."  (Ex. 1003, dkt. 75-4, at 139.)  Kimble appealed, but these decisions were affirmed.

On March 15, 2019, the unit team and Kartman recommended that Kimble be referred for ACRC review again.  Boughton denied the referral.  The unit team and Kartman again requested ACRC review for Kimble in April and May of 2019.  Boughton approved these recommendations, referring Kimble to the ACRC to consider an early hearing.  However, the ACRC declined both requests for an early hearing.

On June 14, 2019, the unit team recommended that Kimble be referred to the ACRC for review, and Kartman joined that recommendation.  Boughton denied it though, because Kimble was scheduled for an administrative confinement hearing the next month.  In early July, the unit team and Kartman recommended Kimble for ACRC review, and Boughton approved the recommendations on July 15, 2019.  The ACRC, comprised of Broadbent, non-defendant Dr. Lemieux, and non-defendant Officer Finnell, held a hearing on July 24, 2019.  At the hearing Kimble stated that:  he was sorry about the past, his behavior had changed and he was no longer a threat; the PACE unit team and Kartman were recommending his release to general population; and he had witnessed an altercation in the dayroom and did not get involved.  While

Broadbent and Finnell recommended that Kimble remain on administrative confinement due to safety and security concerns, Dr. Lemieux dissented because (1) Kimble had not received a conduct report at WSPF, and (2) he had been on Phase 4 for almost a year and he had not had any issues during that time.

Because the ACRC was not unanimous, Boughton reviewed the records. He noted Dr. Lemieux's dissent and that Kimble had been displaying appropriate behavior in his environment, but Boughton still believed that Kimble's violent behavior towards females, which led to his incarceration, along with his violent attack of a female correctional staff member, warranted continued administrative confinement placement. Although not noted in his review, Boughton also considered the fact that he had asked Psychologist Dr. Simcox to complete a risk assessment on Kimble's placement, but the assessment was not complete at that time. (Boughton Supp. Decl., dkt. 121, ¶ 3.) Therefore, Boughton kept Kimble on administrative confinement. On August 9, 2019, Deputy Warden Jaeger reviewed the ACRC's decision and agreed Kimble should remain on administrative confinement. On August 20, 2019, the DAI Administrator agreed, noting that although positive adjustment was noted, a longer period of monitoring was warranted due to the extremely violent attack on the female officer.

From August to December of 2019, the unit team and Kartman continued to recommend Kimble for ACRC review, which Boughton declined to request. Also, in November, Boughton decided to keep Kimble in Phase 4. However, in January, Boughton approved the unit team and Kartman's recommendations for an ACRC hearing, which took place on January 22, 2020. The ACRC consisted of Broadbent, Dr. Lemieux, and non-defendant Officer Torgerson. The ACRC was not unanimous: Broadbent and Torgerson voted to keep Kimble on administrative

confinement, while Dr. Lemieux voted for general population, noting that by that point Kimble had been on Phase 4 for a year and a half, had completed all programming, volunteered on his unit, and was a hard worker.  As before, the decision went to Boughton, who continued to believe administrative confinement was appropriate due to Kimble's history of violent behavior. Boughton further noted that because Kimble was on Phase 4, he could: participate in congregate activities, was not restrained when leaving his cell, and could volunteer in his unit.  (Ex. 1003, dkt. 75-4, 58.)

Additionally, although not noted specifically, Boughton considered Dr. Simcox's risk assessment report, which had been completed at the of July in 2019.  (I address Dr. Simcox's findings below; as a preview, he reported safety concerns about Kimble's placement in general population.)  On January 30, 2020, Jaeger reviewed the ACRC's decision and agreed it was appropriate to retain Kimble on administrative confinement.  On February 4, 2020, the DAI Administrator agreed, noting Kimble's positive adjustment but agreeing that a longer period of monitoring was appropriate.  Kimble appealed the decision, but the placement decision was affirmed.

On February 21, 2020, the unit team recommended that Kimble be referred to the ACRC for review, and Kartman agreed.  Boughton denied the recommendation because of the recent ACRC hearing.

## G.  Kimble's Risk Assessment Evaluation

As just noted, after Kimble's January 2019 ACRC hearing, Boughton asked Dr. Andrew Simcox, a psychologist at WSPF, to complete a risk assessment evaluation of Kimble.  Boughton

explains that he wanted an assessment from a well-qualified psychological professional who had no prior history with Kimble.

Boughton attests that he did not require Kimble to participate in the assessment, and that he made it clear to both Dr. Simcox and Kimble that if Kimble did not want to participate, then he did not have to. Kimble disputes this, claiming Boughton coerced him into participating, making Kimble believe that he would not consider him for general population placement if he did not comply, and that on May 2, 2019, Dr. Simcox told him that Boughton was going to have him assessed whether he agreed or not. (Kimble Decl., dkt. 112, ¶ 6.) Kimble has not attested that Boughton was aware of Dr. Simcox's statement.

As a part of the risk assessment, Dr. Simcox reviewed Kimble's central files, PSU file, legal file, electronic medical records, a 1999 pre-sentence investigation, and a handwritten note Kimble provided him that listed staff members who recommended that Kimble progress through PACE or be released to general population. Dr. Simcox requested documentation from the 2015 staff assault and corresponding criminal case, interviewed Waupun's security director, interviewed Kimble multiple times, and administered the Minnesota Multiphasic Personality Inventory to Kimble.

Dr. Simcox noted Kimble's primary diagnosis was antisocial personality disorder, commenting that Kimble's case appeared "rather extreme." (Ex. 1008, dkt. 76-1, 10.)[7] He further observed that although Kimble had not had any recent conduct reports in the years preceding the 2015 attack on the correctional officer, concluding: "[T]here is no clear relationship between the absence of conduct problems or his compliance with programming as

---

[7] Kimble disputes the quality of several of Dr. Simcox's statements, but defendants' recitation of the assessment is accurate, and Kimble does not come forward with evidence creating a genuine dispute as to the statements within the assessment.

reducing his risk of violent attack against a staff member outside of a highly structured environment." (*Id.* at 13.)    Accordingly, Dr. Simcox determined that release to general population was not recommended, noting specifically that his release to general population "would likely provide Mr. Kimble access to an isolated female staff member," and administrative confinement would increase staff safety.  (*Id.*)  Dr. Simcox did add, however, that Kimble did not appear to pose a risk to other inmates or male staff, or when multiple staff are together.  Dr. Simcox therefore added, that a program of release to group activity could be safely implemented, although it would exhaust considerable resources.  Dr. Simcox then stated a sex offender program would be appropriate to address Kimble's risk for aggression, but that program was not available at WSPF or any other maximum security institution in Wisconsin, and in any event, Kimble did not appear ready for such programming because he did not appear willing to openly discuss his pattern of abuse.

## H.  Boughton's Overall Assessment and Kimble's Current Placement

Boughton attests that Dr. Simcox's risk assessment reinforced his belief that Kimble remained a threat to others.  Boughton acknowledges that Kimble had not caused any problems at WPF, but he states that compliance with policies and fulfilling the HROP/PACE programming requirements are not the only considerations regarding movement through the program or out of AC.  Boughton explains that the anticipated time frames for the program phases are not set in stone: they are general guidelines for the average inmate's progression through the phases. Furthermore, although Kimble was assigned to Phase 4 for an extended period of time, it was the least restrictive PACE phase, meaning he had many of the same privileges as general population inmates, including being out of his cell without his restrains in his housing unit, but

in a controlled setting, which ensured safety while providing Kimble opportunities to demonstrate positive change.

On June 30, 2021, while these motions for summary judgment were pending, Kimble was removed from administrative confinement and placed in general population.

OPINION

I.      **Summary Judgment Standard**

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence on which the jury could reasonably find for the nonmoving party to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  When the parties cross-move for summary judgment, the court looks to the burden of proof that each party would bear on an issue at trial and requires that party to go beyond the pleadings to affirmatively establish a genuine issue of material fact.  *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).  If either party fails to establish the existence of an element essential to his or her case, and on which that party will bear the burden at trial, then summary judgment against that party is appropriate.  *Mid. Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995).

II.     **Fourteenth Amendment Due Process**

A prisoner bringing a due process claim challenging the process afforded to him with respect to his placement in restrictive housing must prove that: (1) he has a liberty or property

interest with which the state interfered; and (2) the procedures he was afforded following that interference were constitutionally deficient. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).  In this case, defendants seek summary judgment with respect to both elements.

### A.      Deprivation of a Liberty Interest

In this circuit, "a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697-98 (7th Cir. 2009).  Courts in this circuit generally have concluded that short-term placements in segregation – typically less than six months – do not involve a liberty interest.  However, longer periods in segregation *do* require inquiry into the conditions to determine if they impose an "atypical, significant" hardship.  *Id.* at 697 (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (prisoners' liberty interests implicated when placed in segregation depriving them of virtually all sensory stimuli or human contact for an indefinite period of time)).  A placement in administrative confinement for a substantial period of time—over ten years—amounts to a loss of liberty without considering the conditions of confinement.  *Isby v. Brown*, 856 F.3d 508, 526 (7th Cir. 2017 ).

Accordingly, my analysis of Kimble's stay in administrative confinement requires consideration of his conditions of confinement to determine whether he suffered an atypical and significant hardship sufficient to implicate his due process rights.  *See Marion*, 559 F.3d at 698; *Rodriguez v. Haines*, No. 14-CV-86-JDP, 2015 WL 9296308, at *5 (W.D. Wis. Dec. 18, 2015)

(administrative confinement status for over four years might impose an atypical and significant hardship).

Defendants argue that Kimble has not submitted evidence sufficient to support a finding that his time on administrative confinement amounted to an atypical and significant hardship that has deprived him of human contact or sensory stimuli.  In opposition, Kimble maintains that because he has been on administrative confinement continuously since 2016, this  amounts to a per se loss of liberty.  Although defendants' argument has some traction, especially based on the evidence of Kimble's experience on Phase 4 of PACE, I conclude that defendants are not entitled to a judgment as a matter of law on this basis.

There is no dispute that administrative confinement inmates have access to legal materials and the electronic law library, certain educational opportunities, religious materials, limited access to phone calls and video visits, two showers a week, and more property items than prisoners on disciplinary segregation.  True, it appears that Kimble's access to indoor and outdoor recreation periods could be as meager as five hours per week, but the evidence of Kimble's baseline privileges since 2016, taken as a whole, shows that he was not deprived of *all* opportunities for human contact or sensory input.

For example, since August of 2018, Kimble has been in Phase 4, where he has many of the same privileges as general population inmates, including eating meals in the day room, participating in activities with up to three other inmates, working within his unit, and up to 10 hours out-of-cell leisure activity per week, with the exception that he requires an escort and close monitoring by security staff.  Although Kimble states that he has access to a smaller variety of property items than general population inmates, Kimble does not dispute that he *does* have

access to soft-cover books, legal materials, a radio or television, hygiene items, and the canteen. Kimble has not explained how the denial of other items – a fan, typewriter, hardcover books, certain types of writing instruments, personal clothes, and hobby items–deprives him of sensory stimulus or human contact, given his access to the other property items. Thus, defendants have a legitimate basis to contend that Kimble's current conditions in administrative confinement do not implicate his due process rights.

All this being so, there's more to the story. Neither side has submitted sufficient evidence for the court to determine the number of hours per day, or per week, that Kimble could spend on out-of-cell activities, including recreation and his jobs. There are other questions about Kimble's pre-August 2018 experience on administrative confinement. Kimble was on administrative confinement starting in June of 2016, and assigned to the Red Phase that July. He remained in that most restrictive phase until September of 2016, and then was promoted to the Yellow Phase of HROP. He stayed in the Yellow Phase for the next two years. Although the Yellow Phase afforded Kimble a few more privileges than the Red Phase (including six hours of out-of-cell activity in addition to programming), defendants have not submitted precise details about Kimble's confinement during that period of time. Since it is undisputed that Kimble was subject to more restrictions within administrative confinement for well over two years, that lengthy time frame, alone, may permit a reasonable finding that Kimble suffered an atypical and significant hardship during that time frame.

The bottom line is that I will not enter summary judgment for defendants on the ground that his confinement in administrative confinement did not amount to the loss of a liberty interest.

Nor are defendants entitled to qualified immunity on this point. "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). Whether a right was "clearly established" is grounded in the notion of fair notice. The Court of Appeals for the Seventh Circuit has explains that this means that "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted). Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

Defendants maintain that Kimble's continuation on administrative confinement does not amount to a deprivation of liberty. They cite *Lagerstrom v. Kingston*, 463 F.3d 621 (7th Cir. 2006), in which the court commented that a transfer to the more restrictive conditions present at WSPF may not necessarily amount to a deprivation of liberty, since the inmate might have already been confined in segregation. *Id.* at 623. Although the language in *Lagerstrom* may raise questions about the due process implications of a transfer, in that case the court did not discuss the due process rights of inmates kept on administrative confinement for years at a time. By contrast, in *Isby* the court explicitly stated that "prison officials have been on notice since *Hewitt v. Helms*, 459 U.S. 460 (1983)] that periodic reviews of administrative segregation are constitutionally required," 856 F.3d at 530. It follows that because Kimble was placed on administrative confinement in 2016 and that status remained unchanged until June 30, 2021, he had a clearly established right to a meaningful review of that placement.

Nonetheless, as discussed in the next section, defendants are entitled to summary judgment because their review of Kimble's placement and restrictions provided him with all of the process that the Constitution requires.

**B.      Deficient Procedures**

Due process requires prison officials to periodically review whether an inmate placed in administrative segregation continues to pose a threat or whether the inmate can be transferred to less restrictive housing.  *Isby*, 856 F.3d at 528; *Westefer v. Neal*, 682 F.3d 679, 686 (7th Cir. 2012) ("Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate.  Prison officials must engage in some sort of periodic review of the confinement of such inmates," citing *Hewitt*, 459 U.S. at 477 n.9).  Although due process may not require prison officials to submit additional evidence or statements to support their confinement decision, the "periodic review must still be meaningful and non-pretextual." *Isby*, 856 F.3d at 527 (citing *Westefer*, 682 F.3d at 686).  For example, a meaningful review, "evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted." *Id*. Essentially, this requires prison officials' decision to maintain a prisoner on administrative confinement status to be supported by "some evidence." *See Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011).

Kimble's placement has been reviewed monthly by his unit team, Kartman, and Boughton, and every six months–sometimes more often–by the ACRC.  Kimble has not submitted evidence suggesting that defendants' handling of any of these reviews did not meet this low standard.

32

### 1.  Dickman, Mink, and Kartman

Kimble's claim against Dickman, Mink, and Kartman is limited to their monthly reviews between November 2016 and November 2017, when they did not recommend that Kimble advance from the Yellow Phase to the Green Phase.  The State seeks summary judgment with respect to these defendants because (1) HROP was a voluntary program and Boughton ultimately controlled progression of inmates through the phases, and (2) regardless, Kimble was afforded adequate process through his monthly reviews.[8]  In opposition, Kimble maintains that Boughton's December 2016 directive that they maintain him on the Yellow Phase while his criminal charges were pending shows that these defendants' reviews were *not* meaningful.

Defendants' first argument falls short.  Defendants contend that Kimble has no constitutional right to participate in HROP, citing *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999), in which the court held that there was no liberty or property interest in attending a voluntary cooking class.  This is an apples-to-oranges comparison: Kimble didn't want to clarify butter, he wanted to demonstrate that he was ready to return to general population, and successfully completing HROP was a necessary predicate for doing this.  I accept that the unit team and Kartman were only making recommendations about Kimble's advancement, but their favorable recommendations were a necessary step in that advancement. There is no evidence that Boughton ever would approve an inmate's HROP advancement–or simply move an inmate from administrative confinement to general population–in the absence

---

[8] Defendants further point out that Kartman claims that he was unaware that Boughton had instructed the unit team not to advance Kimble out of the Yellow Phase at the end of 2016.  Because Kimble disputes this, I will assume that Kartman was aware of Boughton's instructions for purposes of summary judgment.

of favorable recommendations from the committee and Kartman. Therefore, I conclude that the reviews themselves were required to be meaningful, not merely a sham.

That said, the reviews of Kimble's placement by Dickman, Mink, and Kartman actually were meaningful. Kimble contends otherwise, citing Boughton's directive to the unit team to keep Kimble on Yellow Phase from December 2016 to November 2017. The fact that Boughton issued this directive is undisputed, but it did not prevent the unit team from performing a genuine review of Kimble. A head coach might direct his assistants to keep a particular player on the JV squad, but that wouldn't prevent those assistants from assessing that player's skill set and readiness on their own; the fact that they might then conclude that the player actually is not ready for varsity does not make their assessment a sham. So it is with Kimble. The evidence shows that these defendants considered Kimble's behavior during this period and the feedback they gave Kimble was substantive and clear: Kimble had shown positive behavior, had not had any disciplinary infractions, and the warden believed that he should remain in the Yellow Phase because of his crime of conviction and attempted murder of a correctional officer. These were legitimate reasons to maintain the restrictions associated with Yellow Phase inmates.

Keep in mind that during the first five months of the reviews that Kimble is challenging, his charge of attempted murder of a correctional officer remained pending. Even assuming that Kimble's recent behavior was impeccable and he had completed all required programming, these defendants were on solid ground to deem Kimble too dangerous to advance to Green Phase, which would have given him more access to other inmates and staff. In any event, no evidence of record suggests that Dickman, Mink, or Kartman failed to consider Kimble's ongoing behavior and programming while the criminal charges were pending. Rather, the unit team's review

continued to incorporate Kimble's updated materials, and during monthly reviews they included the behavioral issues that were noted in Kimble's materials, including a "fishing" incident, a torn mattress, and a request for additional programming. These reviews were not a sham.

When Kimble was sentenced to an additional 15 years' incarceration for the attempted homicide charge on April 7, 2017, Boughton's reasoning changed somewhat: he determined that Kimble should remain on Yellow Phase where he would have to demonstrate positive behavior for an extended period of time.

The unit team and Kartman agreed for the next six months. As before, they continued to consider updated information about Kimble's programming and behavior during this period. Although Kimble might believe that Dickman, Mink, and Kartman should have dissented from Boughton and should have recommended him to be advanced into Green Phase, Kimble's only evidence in support is his completion of the programming and his good behavior. Yet these defendants were not *required* to recommend advancement based upon completion of programming and good behavior alone, and Dickman, Mink, and Kartman specifically attest that they considered Kimble's recent behavior and programming each month. (Dickman Decl., dkt. 81, ¶¶ 31-34; Mink Decl., dkt. 78, ¶ 14; Kartman Decl., dkt. 77, ¶¶ 25-28.) More importantly, their deferral to Boughton was based on considerations related to staff and inmate safety, issues properly before the unit team and Kartman, thus satisfying the "meager" standard that the evidence relied on to support their recommendation bears "some indicia of reliability." *Scruggs v. Jordan*, 483 F.3d 934, 941 (7th Cir. 2007). Although Kimble disagrees with this approach to his progression through the HROP phases, he had not submitted evidence that the Dickman,

35

Mink, or Kartman did not actually consider updated information about his behavior on a monthly basis, or indicate to Kimble truthfully why he was not progressing to the next phase.

These reviews were sufficient to qualify as "meaningful" under *Isby*, 856 F.3d 508. Like Kimble, Isby's administrative confinement placement started after he seriously assaulted prison officials. Isby was placed in administrative confinement ("SCU" in Indiana) continuously for more than ten years following a 1990 incident in which Isby stabbed two correctional officers and a dog was killed. *Id.* at 512. State law required prison officials to review Isby's placement in SCU every 30 days. For 10+ years, they wrote the same two sentences every month as their justification.[9] The Seventh Circuit disapproved of the review of Isby's administrative confinement placement, reversing the entry of summary judgment in favor of the prison officials. Although the court accepted that the procedures required by due process are extremely limited, it recognized that under *Hewitt*, there needs to be *some* indication that the review was meaningful, such that the review is "open to the possibility of a different outcome." *Id.* at 528. Given the length of Isby's administrative confinement placement, as well as conflicting evidence as to the *actual* reason for his ongoing segregation, the court found there were triable issues of fact regarding whether Isby's reviews were actually meaningful, "given . . . the rote repetition of the same two boilerplate sentences following each review." *Id.* Critically, the court did not fault the prison officials for the *actual* reasons for his placement, instead commenting that "even one or two edits or additions along these lines could assuage our concerns and provide helpful notice to Isby as to the reasons for his placement and how he could get out." *Id.* at 527.

---

[9] "Your status has been reviewed and there are no changes recommended to the Southern Regional Director at this time. Your current Department-wide Administrative segregation status shall remain in effect unless otherwise rescinded by the Southern Regional Director." *Isby*, 856 F.3d at 515.

The circumstances presented by Kimble are less extreme than those confronting Isby. Having been released from administrative confinement earlier this summer, Kimble spent slightly more than five years in administrative confinement, about half of what Isby endured. Kimble's conditions of confinement in administrative confinement mirrored those of WSPF's general population in many respects, in contrast to the harsh conditions imposed on Isby. More importantly, the monthly reviews by Kimble's unit team were not rote. True, the unit team and Kartman did repetitively flag Kimble's crime of conviction and 2015 assault and they did repetitively recommend that Kimble remain in the Yellow Phase based on the warden's recommendation and Kimble's assault on the Waupun correctional officer. But these were relatively recent events, particularly compared to Isby's 1990 assault and canicide. More importantly for due process purposes, the unit team's reviews continuously  and explicitly incorporated Kimble's positive behavior on a monthly basis, along with the note that the warden wanted Kimble to continue on Yellow Phase. Kimble might disagree with the team's resulting recommendations, given that he *did* demonstrate good behavior, but it is undisputed that Kimble was well-aware that Boughton wanted Kimble to remain on Yellow Phase while his criminal case was open, and then for an extended period of time after Kimble pled no contest and received the 15-year sentence. As such, the unit team's recommendations were not only truthful but also provided Kimble clear notice of the reason for his continued placement.

That's pretty much the end of it, but there's an unusual coda to this phase of the analysis: Warden Boughton, who was the ultimate decisionmaker for Kimble's HROP advancement, asked the team to retain Kimble on the Yellow Phase, and they did, per his request. According to Kimble, the reviews conducted by Kimble, Mink, Dickman and Kartman

from September 2016 to November 2017 by definition could not have been "meaningful" because the team invariably based its recommendations on the warden's request not to advance him.  But Kimble has not come forward with evidence suggesting that their apparent deferral to Boughton's judgment ran contrary to their own judgment, or that Kimble did not receive notice that Boughton's judgment ultimately governed when he would be able to advance from Yellow to Green.

True, the court in *Isby* indicated that the reviews Isby received should have given him some indication how he could "get out" of administrative confinement.  But Kimble's situation is different.  Such an explicit explanation was unnecessary because it was made abundantly clear to  Kimble that the assault itself was what undergirded Boughton's judgment.  Indeed, on November 29, 2016, Boughton wrote to Kimble to explain that Kimble would remain in the Yellow Phase because of his pending attempted homicide charges (Ex. 1011, dkt. 76-2, at 1), and the record of Kimble's December 7, 2016 unit team meeting shows Kimble understood that the unit team was on board with Boughton's plan. *(See* Ex. 1004, dkt. 75-76, 83.)  Further, after Kimble's sentencing in April 2017, Kimble complained directly to Boughton about his inability to advance, and on July 3, 2017, Boughton responded to Kimble that he was not comfortable moving Kimble out of Yellow Phase, citing his crime of conviction and the assault at Waupun. (*See* Ex. 1011, dkt. 76-1, at 12.)

Perhaps more importantly, for qualified immunity purposes, *Isby* is not on all fours with Kimble's circumstances.  Kimble has not cited any Seventh Circuit or Supreme Court case from 2017 or before that faulted prison officials for deferring to their warden's judgment that a prisoner should remain on a more restrictive phase of administrative confinement because of

pending criminal charges or a recent criminal sentence.  Absent such authority, these defendants would not have had fair notice  that their deference to the warden's judgment might violate Kimble's due process rights.  Thus, qualified immunity shields them from liability for monetary damages as well.  *Campbell*, 936 F.3d at 545 (to be clearly established, a constitutional right must have a sufficiently clear foundation in then-existing precedent).

### 2.  Winkleski

Winkleski's involvement was limited to two reviews: the June 2016 determination to approve Kimble's placement on the Red Phase of HROP, and the October 2017 recommendation that Kimble remain on the Yellow Phase of HROP.  Kimble is not proceeding on a due process claim related to his June 2016 placement in the Red Phase, so I need not address Winkleski's involvement in that placement.

As for the October 2017 recommendation, Kimble has not submitted evidence that in making either recommendation, Winkleski's review was pretextual or that he lacked a legitimate basis to recommend Kimble's placement at the Yellow Phase.  Although Kimble would point to Boughton's directive that he remain on Yellow Phase while his criminal lawsuit was pending, I already have determined that Kimble's criminal charges provided a legitimate basis for prison officials to find that he remained a danger to staff and inmates.  Accordingly, Winkleski is entitled to summary judgment in his favor as well.

### 3. Broadbent

Defendants seek summary judgment on Kimble's claim against Broadbent because Kimble does not actually have the right to call witnesses for purposes of his administrative confinement review. In opposition, Kimble argues that Broadbent showed bias against him in the manner in which he handled Kimble's ACRC reviews. Kimble faces an uphill battle: "the constitutional standard for impermissible bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003). Prisoners do not have a constitutional right to call witnesses or to require prison officials to interview witnesses. *Westefer*, 682 F.3d at 685; *see also Martin v. Zatecky*, 749 F. App'x 463, 466 (7th Cir. 2019) (prisoner does not have a right to call witnesses who would give irrelevant, repetitive, or unnecessary testimony).

I granted Kimble leave to proceed against Broadbent based on Kimble's assertion that Broadbent repeatedly denied him requested witnesses and evidence. Defendants responded with undisputed evidence showing why Broadbent denied Kimble's numerous requests for witnesses. For example, Broadbent explained that certain witnesses were unavailable because they were located at another institution; further, those witnesses' testimony would have been repetitive of Kimble's administrative confinement packet provided by these same people. Kimble disagrees with Broadbent's reasoning, but there is no evidence that his decisions actually impeded Kimble's ability to make a statement prior to or during his ACRC hearings, or precluded Kimble from submitting evidence that would have militated in favor of his removal from administrative confinement. Critically, Kimble has not come forward with even a scintilla of evidence suggest that would suggest that Broadbent's decisions were a product of bias. *Cf. Thomas v. Reese*, 787 F.3d 845, 849 (7th Cir. 2015) (adverse rulings do not constitute evidence of judicial bias).

Kimble has not submitted any other evidence to support his due process claim against Broadbent.  As such, there is no basis to conclude that Broadbent was biased against him, or that Broadbent failed to afford Kimble the process he was due during any of his ACRC hearings. To the extent Kimble questions Broadbent's judgment, Broadbent and the ACRC have been unanimous on almost every review of Kimble's placement.  Therefore, Broadbent is entitled to summary judgment as well.

### 4.  Boughton

Finally, Warden Boughton is entitled to summary judgment.  I granted Kimble leave to proceed against Boughton based on his allegations that Boughton refused to advance him through the HROP and PACE programs between 2017 and 2019, instead maintaining Kimble on administrative confinement status.  Having reviewed all of the evidence of record and assuming that Kimble had a protected interest in a periodic review of his placement, I conclude that Boughton's reviews of Kimble's placement pass constitutional muster.  Further, given Kimble's recent return to general population, his request for injunctive relief now is moot. *See Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009).

In evaluating Boughton's judgment calls between 2017 and 2021, I must bear in mind that courts "are not super-wardens who sit to critique the efficacy or wisdom of prison management choices." *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).  Rather, as discussed above, what the court must consider is whether Boughton's review of Kimble's placement was supported by some evidence suggesting that Kimble remained a danger to inmates and staff, *see* Wis. Admin. Code §§ DOC 308.04(2)(a),(b).

41

Every time that Boughton addressed Kimble's placement--whether related to Kimble's HROP/PACE placement or administrative confinement placement generally--the basis for Boughton's decision was the same: he determined that Kimble's placement in general population would create a reasonable risk that Kimble could engage in violent behavior again.  Throughout this process, Boughton acknowledged Kimble's improved behavior, but he remained concerned that Kimble remained a threat to staff and inmates.  This concern arose out of Kimble's original crime of conviction coupled with Kimble's 2015 attempted murder of a staff member.  Boughton concluded that these dangerous act sufficiently outweighed Kimble's positive adjustment so as to require Kimble to remain where he was.  Kimble has not come forward with evidence suggesting Boughton believed otherwise.

Corroboration of Boughton's *bona fides* is provided by his 2019 request that Dr. Simcox review Kimble's placement. The fact that Boughton sought a second opinion from a medical professional demonstrates Boughton  did not intend to keep Kimble in administrative confinement indefinitely.   Kimble scoffs at this, characterizing Dr. Simcox's report as a fraudulent attempt to cover up Boughton's failure to afford due process to Kimble.  Kimble is entitled to his opinion, but without factual support, that opinion won't forestall summary judgment.  *See Bordelon v. Bd. of Ed. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) ("Rule 56 requires something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")(citation omitted); *cf. Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 548 (7th Cir. 2011)(in context of employment discrimination case, plaintiffs' subjective beliefs do not, by themselves, create a genuine issue of material fact)(citation omitted).

42

Regardless, after Dr. Simcox's assessment, Boughton's communications with Kimble provided clear and accurate guidance about what Kimble should do to keep his privileges and have a chance to obtain more privileges and graduate to general population: continue demonstrating positive behavior. (Boughton Decl., dkt. 76, ¶ 170.) That information was all that due process requires.

In sum, there is no dispute that Kimble received meaningful monthly and semi-annual reviews of his placement in, and within, administrative confinement, from when he was first placed in administrative confinement in 2015, until his release to general population on June 30, 2021. Therefore, Kimble is not entitled to partial summary judgment, and defendants are entitled to summary judgment. Although defendants raise other grounds in support of their motion, I need not reach them.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. 71) is GRANTED.

2) Plaintiff Bobby Kimble's motion for partial summary judgment (dkt. 55) is DENIED.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 26th day of August, 2021

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge